UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARTHUR DAWSON, RONALD MOORE and
GREGORY PETERS on behalf of themselves
 and others similarly situated

Plaintiffs

v.                                                    CIVIL ACTION NO.: 1:15-cv-02092

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY

Defendant

## CLASS ACTION COMPLAINT

### INTRODUCTION

1. Plaintiff, Arthur Dawson, Ronald Moore and Gregory Peters on behalf of themselves and

   all similarly situated persons bring this action pursuant to the Washington Metropolitan

   Area Transit Authority (WMATA) Compact and Section 9-1107.01, *et seq.* of the D.C.

   Code.  Plaintiffs' claims are for breach of contract against WMATA.  This Court has

   subject matter of Plaintiffs' claims pursuant to D.C. Code Section 9-1107.01 (80) and

   (81).

2. Defendant, WMATA and Plaintiffs entered into a lawful contract governing the terms

   and conditions of Plaintiffs' employment as WMATA "supervisors."

3. The terms of the parties 'contract provide for Plaintiffs, as supervisors, to be paid at an

   amount equal to or greater than five percent (5%) of Plaintiffs' direct reports.

4. At all times relevant to this Complaint, Defendant has refused to pay Plaintiffs a salary

   equal to or greater than 5% over Plaintiffs' direct reports.

1

5.  Plaintiffs have suffered damages as the result of Defendant's breach and Plaintiffs seek declaratory, equitable and monetary relief.

6.  Plaintiffs will seek class certification of their claims under D.C. Code Section 9-1107.01 (80) and (81) and pursuant to Fed. R. Civ. P. Rule 23(a) and (b) or alternatively (c)(4).

7.  Plaintiffs will seek class certification of their claims under Local Civil Rule 23.1.

## JURISDICTION AND VENUE

8.  Jurisdiction exists in this Court pursuant to the compact between Maryland, Virginia and D.C codified at D.C. Code Section 9-1107.01 (81).

9.  Jurisdiction in this Court is proper under the Eleventh Amendment as WMATA has waived sovereign immunity for all contract claims under District of Columbia law. D.C. Code Section 9-1107.01 (80).

10. Venue is proper in this Court under 28 U.S.C. §1391(b) because the actions giving rise to the breach of contract occurred in the District of Columbia.

## PARTIES

11. Plaintiff, Arthur Dawson, is a resident of the state of Maryland.

12. Plaintiff Dawson was employed by WMATA as a supervisor at all times relevant to this lawsuit.

13. Plaintiff, Ronald Moore, is a resident of the District of Columbia.

14. Plaintiff Moore was employed by WMATA as a supervisor at all times relevant to this lawsuit.

15. Plaintiff, Gregory Peters, is a resident of the state of Maryland.

16. Plaintiff Peters was employed by WMATA as a supervisor at all times relevant to this lawsuit.

17. Defendant, Washington Metropolitan Area Transit Authority is an interstate quasi-governmental entity established by Maryland, Virginia and the District of Columbia for the purposes of operating a public transit system in the District of Columbia, Maryland and Virginia (DMV) area.

18. Defendant's corporate headquarters are located at 600 5th Street, Washington, D.C. 20001.

## FACTUAL BACKGROUND APPLICABLE TO CLASS ALLEGATIONS

19. At all times relevant to this Complaint Plaintiffs have been employed as supervisors or managers with Defendant.

20. At least as early as December 23, 2011, Defendant  and Plaintiffs had a valid employment contract governing many of the terms and conditions of Plaintiffs' employment as supervisors or managers with Defendant.

21. Defendant memorialized the terms of this agreement in Defendant's Metro Policy Instruction manual.

22. The aforementioned agreement was distributed to all Plaintiffs on or around December 23, 2011.

23. The aforementioned agreement has remained in effect during all times relevant to this complaint and remains in effect as of the date of this complaint.

24. Among other things, the aforementioned agreement establishes salary administration and compensation requirements applicable to non-represented Defendant employees.

25. Plaintiffs, at all times relevant to this complaint, are and/or were non-represented Defendant employees.

26. Plaintiffs' pay and benefits, as non-represented supervisors and managers, and any Defendant adjustments thereto are defined and controlled by the parties' agreement

27. The aforementioned agreement defines supervisors and managers as the following:

    a.  First Line Supervisor: refers to a non-represented employee, whose usual and regular duties and responsibilities, as defined and detailed in the formal position description, is to directly and principally supervise the work of represented employees

    b.  Supervisor/Manager: refers to a non-represented employee, whose usual and regular duties and responsibilities, as defined and detailed in the formal position description, is to directly and principally supervise the work of non-represented employees.

28. At all times relevant to this complaint, Plaintiffs were performing the functions as "supervisors" or "managers" as defined by the parties' agreement.

29. Plaintiffs, at all times relevant to this complaint, supervised represented and/or non-represented Defendant employees.

30. For example, Plaintiffs are responsible for directing the work assignments for represented and non-represented employees, approving and disapproving leave for said employees, managing and directing the shift assignments of said employees, and other duties in the supervision of said employees that are within the Plaintiffs' position descriptions and/or are typically associated with the supervisor/employee relationship.

31. Pursuant to the parties' agreement, Defendant is required to conduct periodic reviews of the salaries paid to managers and supervisors.

32. Defendant's review, in particular, must identify supervisor and manager salary "compression" and make comprehensive salary adjustments upon a finding of "compression."

33. Under the parties' agreement, Defendant, after periodic review, Defendant is required to make comprehensive supervisor and manager salary adjustments to adjust for salary "compression."

34. Under the parties' agreement, salary "compression is defined as occurring: "when a supervisor or manager experiences less than a five percent (5%) higher pay differential between their salary and that of their highest paid direct reporting subordinate.

35. According to the parties' agreement, Defendant is required to review Plaintiffs' salaries and that of Plaintiffs' highest paid direct reporting subordinate on an annual basis.

36. If Defendant's review demonstrates the presence of "salary compression "and that supervisor or manager salary is less than 5% greater than his or her highest paid direct report, then Defendant is required to adjust the salaries of supervisors and managers to remedy the salary "compression."

37. Under the parties' agreement, Defendant does not have subjective discretion to ignore salary compression and/or refuse to adjust manager and supervisor salaries to remedy salary compression.

38. Under the parties' agreement, Defendant does not have objective discretion to ignore salary compression and/or refuse to adjust manager and supervisor salaries to remedy salary compression.

39. To the contrary, Defendant may only refuse to adjust supervisor and manager salaries to remedy salary compression under limited circumstances and with circumscribed discretion.

40. Upon information and belief, from 2011 to 2015 Defendant has conducted annual reviews of salary compression.

41. From 2012 to 2015 Plaintiffs have been subject to salary compression and have been paid less than 5% more than plaintiffs' direct reporting subordinates.

42. From 2012 to 2015 the structure of Defendants compensation to Defendant's supervisors and managers has been "compressed" and a majority of Plaintiffs (the class of Defendant Supervisors and/or Managers) have been paid less than required under the parties' agreement and subjected to salary compression.

43. From 2012 to 2015 Defendant has been aware of the requirement to review the salaries of its supervisors and managers and to adjust those salaries to remedy salary compression.

44. From 2012 to 2015 Defendant has refused to adjust the salaries of Plaintiffs (supervisors and managers) to remedy salary compression in violation of the parties' agreement.

45. From 2012 to 2015 Defendant was not excused by any term of the parties' agreement to refuse to make the required salary adjustments to eliminate salary compression.

46. In fact, From 2012 to 2015, Defendant was aware of its obligation to eliminate known salary compression and took affirmative steps, in violation of the parties' agreement, to circumvent the contractual requirement to adjust salaries.

47. For example, Defendant manipulated its "PeopleSoft" Human Resources software to breach its contract with Plaintiffs and fail to pay Plaintiffs an adjusted salary from 2012 to 2015 to eliminate salary compression.

6

48. To accomplish this, Defendant, through its agents, systematically changed the coding for Plaintiffs' direct reports and other reporting employees in its PeopleSoft Software.

49. By changing the coding for these direct reports, Defendant made it appear that Plaintiffs had fewer or no direct reports in its PeopleSoft software.

50. Defendant purposefully manipulated its PeopleSoft software to show that Plaintiff had few or no direct reports to avoid its obligations under agreements.

51. At the time Defendant manipulated its PeopleSoft software, it was aware that a) Plaintiffs had direct reports and b) the pay differential between Plaintiffs' direct reports and Plaintiffs' salary was less than 5%.

52. Defendant manipulated its PeopleSoft software to conceal the fact that there was salary compression and breach its agreement with Plaintiffs.

53. In other words, Defendant removed Plaintiffs' direct reports in its human resources system to avoid an adverse compression analysis or invoking the contractual provision requiring Defendants to eliminate salary compression and adjust Plaintiffs' salaries.

54. Despite Defendant removing Plaintiffs' direct reports from its "PeopleSoft" software, Plaintiffs continued to supervise direct reports as defined by the parties' agreement.

55. Despite Defendant removing Plaintiff's direct reports from its "PeopleSoft" software, Plaintiffs continued being responsible for directing the work assignments for represented and non-represented employees, approving and disapproving leave for said employees, managing and directing the shift assignments of said employees, and other duties in the supervision of said employees that are within the Plaintiffs' position descriptions and/or are typically associated with the supervisor/employee relationship.

56. Defendant breached the parties' contract by not counting these direct reports in its annual compression analysis.

57. Defendant breached the parties' contract by not adjusting the Plaintiffs salary to account for the salary compression which was known by Defendant to exist from 2012 to 2015.

Plaintiff Arthur Dawson

58. Plaintiff, Arthur Dawson, has been a supervisor non-represented employee with Defendant at all times relevant to this case.

59. Mr. Dawson is a supervisor in Defendant's maintenance and inspection operations.

60. At all times relevant to this complaint, Mr. Dawson was the supervisor of direct reports.

61. At all times relevant to this complaint, Mr. Dawson supervised an "inspection crew."

62. Among Mr. Dawson's duties with respect to the employees he supervises within the inspection crew are: directing the work assignments for represented and non-represented employees, approving and disapproving leave for said employees, managing and directing the shift assignments of said employees, and other duties in the supervision of said employees that are within Mr. Dawson's position descriptions and/or are typically associated with the supervisor/employee relationship.

63. In 2015, Mr. Dawson notified Defendant that he was supervising direct reports but that those direct reports did not show up in Mr. Dawson's "PeopleSoft" work profile.

64. In response to Mr. Dawson's inquiry, Defendant admitted that it was "aware of situations wherein some first level supervisors did not show direct reports in PeopleSoft" but that the supervisors had supervision of the same employees.

65. Defendant has been aware of PeopleSoft not identifying Direct Reports from at least 2011 to 2015.

66. Plaintiff Dawson is a supervisor that is not paid at least 5% above his highest paid direct report.

67. Plaintiff Dawson is a supervisor that has been adversely affected by Defendant's breach of contract

68. Plaintiff Dawson is a supervisor that has suffered damages as the result of Defendant's breach of contract.

69. Had Plaintiff Dawson been paid the correct hourly rate from 2012 to 2015, Plaintiff Dawson would have made additional overtime income.

70. Had Plaintiff Dawson been paid the correct hourly rate from 2011 to 2015, Plaintiff Dawson would have earned extra income which would have positively increased his retirement contributions and coordinating retirement benefits.

71. Had Plaintiff Dawson been paid the correct hourly rate from 2011 to 2015, Plaintiff Dawson's base pay for 2011 to 2015 would have been substantially greater than the base pay Plaintiff Dawson was paid from 2011 to 2015.

72. Mr. Dawson has suffered substantial pecuniary and economic damages as a result of Defendants breach of the parties' agreement.

<u>Plaintiff Ronald Moore</u>

73. Plaintiff, Ronald Moore, has been a supervisor non-represented employee with Defendant at all times relevant to this case.

74.  Since 2011, Mr. Moore has been a supervisor with Defendant.

75. From 2011 to present, Mr. Moore has been a direct supervisor to approximately 10 to 12 employees.

76. As a supervisor, Mr. Moore is classified as an LS8 pay band.

77. Among Mr. Moore's duties with respect to the employees he supervises within the inspection crew are: directing the work assignments for represented and non-represented employees, approving and disapproving leave for said employees, managing and directing the shift assignments of said employees, and other duties in the supervision of said employees that are within the Plaintiffs' position descriptions and/or are typically associated with the supervisor/employee relationship.

78. The LS8 pay band designation for supervisors is a non-salaried, hourly pay classification.

79. LS8 supervisors are non-bargaining unit, non-represented employees.

80. LS8 supervisors are entitled to overtime pay based on his or her hourly rate.

81. Overtime pay for LS8 supervisors is calculated at 1.5 times the supervisor's base pay.

82. Similar to LS8 supervisors, LS9 is a supervisory designation and pay classification for WMATA supervisors.

83. LS9 supervisors are a higher level than LS8 supervisors.

84. Like LS8 Supervisors, LS9 supervisors are non-bargaining unit positions, non-represented and paid on an hourly basis, with eligibility for overtime at 1.5 times the supervisor's base hourly rate.

85. From 2012 to 2015 Mr. Moore has been a supervisor in Defendant's "Truck Shop" and Defendant's "Machine Shop."

86. During that time, Mr. Moore has supervised approximately 10-13 employees.

87. As a supervisor, Mr. Moore supervised Truck Shop and Machine Shop employees.

88. Employees directly underneath LS8 supervisors are identified by classifications.

89. The classifications represent the level of experience, skill and tested qualifications of the employees.

90. For example, underneath LS8 supervisors are employees at levels D through AA.  D being the lowest, least experienced level and AA "Leads" being the highest level of experience, underneath the LS8 supervisor.

91. Classification A and Classification AA "leads" are the highest paid non-supervisory positions under the LS8 supervisory classification; with Classification AA "lead" being more highly paid than Classification A.

92. Classification A employees and Classification AA "lead" employees are union represented, bargaining unit positions.

93. From 2012 to 2013 Mr. Moore was paid, approximately, 5% more than his highest paid direct report.

94. From 2012 to 2015, Mr. Moore's highest paid direct report was a AA "lead" mechanic.

95. From 2013 to 2015 Mr. Moore was not paid more than 5% than his highest paid direct report.

96. For example, in 2015, Mr. Moore's highest paid lead mechanic (AA "Lead") was paid an hourly wage of $40.400678.

97. In 2015, Mr. Moore was paid an hourly wage of $40.712231.

98. In 2015, Mr. Moore made $0.311553 per hour more than his highest paid direct report.

99. In 2015, Mr. Moore made approximately 0.7711% more than his highest paid direct report.

100. In 2015 Mr. Moore made $1.7084809/per hour (base rate) less than the hourly rate he should have been paid under the terms of the parties' agreement.

101. On an annual basis, not accounting for overtime, Mr. Moore was paid approximately $3,553.640272 less than he should have been paid for 2015.

102. Between 2013 and 2015 Mr. Moore was paid approximately $10,660.92 less than he should have been paid under the terms of the parties' agreement.

103. From 2013 to 2015 Mr. Moore worked overtime hours.

104. Had Mr. Moore been paid the correct hourly rate from 2013 to 2015 ($1.7084809 higher than his hourly rate) Mr. Moore would have made additional overtime income.

105. Had Mr. Moore been paid the correct hourly rate from 2013 to 2015, Mr. Moore would have earned extra income which would have positively increased his retirement contributions and coordinating retirement benefits.

106. Mr. Moore has suffered substantial pecuniary and economic damages as a result of Defendants breach of the parties' agreement.

<u>Plaintiff Gregory Peters</u>

107. Plaintiff, Gregory Peters, is a current supervisor with Defendant, WMATA.

108. Plaintiff Peters is a supervisor in Defendant's "Truck Shop."

109. Plaintiff Peters has been employed with Defendant since 1999.

110. Currently, Plaintiff supervises approximately 59 employees in the "Truck Shop."

111  Among Mr. Peters' duties with respect to the employees he supervises within the inspection crew are: directing the work assignments for represented and non-represented employees, approving and disapproving leave for said employees, managing and directing the shift assignments of said employees, and other duties in the supervision of said employees that are within Mr. Peters' position descriptions and/or are typically associated with the supervisor/employee relationship.

112  From 2011 to mid-2015, Plaintiff's base pay rate was approximately $38.779937.

113 From 2011 to mid - 2015 Plaintiff Peters' highest paid AA Mechanics, over whom
Plaintiff Peters' is a direct supervisor, were paid a base rate of approximately
$38.831870.

114 From 2011 to 2015 Mr. Peters worked overtime hours.

115 Plaintiff Peters is a supervisor that is not paid at least 5% above his highest paid direct
report.

116 Plaintiff Peters is a supervisor that has been adversely affected by Defendant's breach of
contract

117 Plaintiff Peters is a supervisor that has suffered damages as the result of Defendant's
breach of contract.

118 Had Plaintiff Peters been paid the correct hourly rate from 2011 to 2015, Plaintiff Peters
would have made additional overtime income.

119 Had Plaintiff Peters been paid the correct hourly rate from 2011 to 2015, Plaintiff Peters
would have earned extra income which would have positively increased his retirement
contributions and coordinating retirement benefits.

120 Had Plaintiff Peters been paid the correct hourly rate from 2011 to 2015, Plaintiff
Peters' base pay for 2011 to 2015 would have been substantially greater than the base
pay Plaintiff Peters was paid from 2011 to 2015.

121 Plaintiff Peters has suffered substantial pecuniary and economic damages as a result of
Defendants breach of the parties' agreement.

## CLASS ALLEGATIONS

122. Plaintiffs incorporate by reference paragraphs 1 through 121 as if fully set forth herein.

123. Defendant has breached its contract with Plaintiffs.

124. Defendant has obligations under its contract with Plaintiffs to adjust Plaintiffs' salaries to eliminate salary compression.

125.  Defendant has been aware of salary compression from 2011 to 2015.

126. Defendant may only refuse to adjust Plaintiffs' salaries to eliminate salary compression under limited circumstances.

127. Such circumstances a) did not exist from 2011 to 2015, b) and did not exist to any level that would relieve Defendant of its contractual liability.

128. Defendant manipulated its data regarding Plaintiffs' direct reports in its PeopleSoft software to avoid its contractual obligation to adjust Plaintiffs' salaries.

129. Plaintiffs sue on behalf of themselves and on behalf of all other persons similarly situated pursuant to Rules 23(a) and (b)(3) or Rule 23(c)(4) of the Federal Rules of Civil Procedure.  The proposed class consists of all supervisors or managers who were employed by Defendant from December 23, 2011 to present.

130. The class is so numerous that joinder is impracticable.  During the class period, Defendant employed hundreds of supervisors and managers that supervise direct reports and were not paid greater than a 5% differential between the supervisor or manager's salary and that of their highest paid direct report.

131. There are questions of law and fact common to the class.  All class members are beneficiaries to a single contract between the class members and Defendants.  All class members are employed or were employed as managers and/or supervisors and subject to the same contractual provisions governing salary and salary adjustments.  Common questions, such as: the interpretation of the parties' contract and whether Defendant's compression analysis and breach of the parties' contract was lawful will predominate

over any questions affecting individual supervisors or managers and a class actions is the superior method for adjudicating Plaintiff's allegations.

132. The claims of the class representative are typical of the claims of the class.  There is nothing about the nature of the representative's claims, nor the circumstances surrounding them, that suggest they are atypical or peculiar to the representatives personally.  The gravamen of his claim is shared widely by the supervisors and managers who were employed by Defendant.

133. The class representatives and their legal counsel will fairly and adequately protect the interests of the class.  The class representative has been a supervisor during all times relevant to this complaint.  The class representative discovered that Defendant was misclassifying "direct reports" in its PeopleSoft software.  There is no evidence of any conflicts of interest between class representatives and any members of the putative class.

134. Class counsel for the representative, Morris E. Fischer of the Law Office of Morris E. Fischer, LLC and Daniel E. Kenney of DK Associates, LLC possess the knowledge, skills and resources fully sufficient to represent the putative class.

## COUNT I

### BREACH OF CONTRACT

135. Plaintiffs incorporate by reference paragraphs 1 through 134 as if fully set forth herein.

136. The parties agreed to and are bound by a contract.

137. The parties' contract sets forth the terms and conditions of Plaintiffs' salary compensation.

138. Defendant breached the parties' contract.

139. Defendant refused to make salary adjustments to Plaintiffs' salary between 2011 and 2015 to eliminate salary compression as required by the parties' agreement.

140. Defendant failed to perform its obligations under the contract in good faith.

141. Defendant failed to perform the required annual "compression analysis" as contemplated by the parties' agreement.

142. As a result of Defendant's breach, Plaintiffs suffered contractual damages, including but not limited to: back-wages, loss of retirement benefits, loss of bonus and other incentive compensation, interest and other pecuniary and non-pecuniary damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendant for the following relief:

a) An award of declaratory relief and equitable relief for the lost wages, lost compensation, future lost earnings, economic losses, pre and post judgment interest and any other affirmative relief that may be deemed appropriate at trial;

b) An aware of disbursement, cost, expense, expert witness fees and attorney's fees incurred by Plaintiffs in bringing this action; and

c) Such other relief as the court deems proper and just.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS**

*Morris E. Fischer /s/*
Morris E. Fischer, Esq.
Bar No.: 490369
Law Office of Morris Fischer, LLC
1400 Spring Street, Suite 350
Silver Spring, MD 20910
301-328-7631 Phone
morris@mfischerlaw.com


*Daniel E. Kenney /s/*
Daniel E. Kenney, Esq. *(pro hac vice)*
DK Associates, LLC

16

5425 Wisconsin Avenue, Suite 600
PMB #653
Chevy Chase, MD 20815
202-430-5966 Phone
dan@dkemployment.com